Mr. Fuchs May it please the Court. My name is James Fuchs and I am representing the appellant, his most complicated villain. Complicated because his motivations are so complicated that he's often portrayed sympathetically, perhaps most notably by Laurence Olivier in a production that my former professor and Judge Easterbrook's former colleague David Bevington viewed as extremely wrong-headed. Though motivations for retaliation can often be complicated, as I've just suggested, retaliation is always wrong. This, of course, is a courtroom, not a theater. But the analogy to the theater is apposite in that we are in the second act of an ongoing saga. In the first act, which admittedly is not before your honors, there was a finding that there had been retaliation against my client. Four times in a row, he had had evaluations in which he had been viewed as doing better than average. But all of a Then, actually it was that he was average, but later on there was discussion suggesting that he was even less than average. As events proceeded, your honors, my client brought his case before the EOC and there was a finding that indeed there had been retaliation. And indeed one of the issues in that case, which is one of the issues in this case, was the failed to close out grants. Although the judge in that previous case had found that there were legitimate concerns, she had also found, based on the entire evidence in that case and based on the entire record, that the issue was contrived based on retaliation. In the present case, that issue of closeouts is again exactly the same issue that has been used against my client. And yet, there was no real distinction between closeouts in the previous case and this case. And although the judge in this case made scant reference to the decision in the previous case, there is no explanation, no detail as to why closeouts in that case would be different from closeouts in this case. And yet, the new supervisor in this case not only changed his evaluation, but said that that was the true basis for his decision, even though my client had been out sick at the time. And even though closeouts had been performed by another employee in a practice that had been endorsed by management, the affidavit of the supervisor in the previous case and the supervisor in part of this case, which is the entire basis of that supervisor's affidavit in this case, claimed that closeouts again was the basic issue that was used against my client. Again, there was no distinction by the district court as to why closeouts in that case would be an issue that would be different from closeouts in this case. But not only, Your Honors, is the fact that it's also clear that the retaliation has continued. In this case, there was evidence that the former supervisor, who was the supervisor for part of the case, Eleni Lidias, was extremely concerned about the fact that there had been EEO activity in this case. She actually wrote an email that's on page 194 of the appendix to her supervisor, Stephen Meese, who is also one of the responsible management officials in this case, in which she expressed concerns about Mr. Boss's EEO activity. And not only that, but she made a reference to Mr. Boss's second supervisor in this case, Elmore Richardson, who was the one who was bringing to the attention of Ms. Lidias, and thus to Mr. Meese, the fact that Mr. Boss had been engaged in EEO activity. So the retaliation continues by the same cast of characters. The one difference is that the district court made a decision, again not referring to the previous one, without having had the opportunity to view the witnesses as the administrative judge had done in the past. The analogy to a play is again apt, because after all, as this court has ruled on many occasions, the flesh and blood of a live witness is very, very important. Now another issue in this case, Your Honors, is that Mr. Boss's psychiatrist, who was a fact witness, was able to determine that there was a great deal of discrimination against Mr. Boss. But he not only discerned discrimination, but he discerned the extreme difficult effects upon Mr. Boss. And he compared Mr. Boss to other patients that he had had. Now both the Dr. Farhardo, who was the treating psychiatrist, was a fact witness, as opposed to an expert witness. Dr. Farhardo would have been an expert witness in this case. He was prepared to testify. His deposition had been set to be taken. However, Dr. Farhardo, who is on the staff of the Institute of Psychoanalysis in Chicago, was extremely busy at the time and had wanted to work on his finals, and so we had asked for a continuance, and the judge refused to grant it. So because the judge refused to grant that continuance, we could not designate Dr. Farhardo as a fact witness, I mean as an expert witness, and instead designated him as a fact witness, and therefore we do believe that using him as a fact witness is important in this case. And again, it wasn't simply a case of his looking at the subjective state of Mr. Boss, though that is an issue. He was also looking at the situation objectively, because he was in fact comparing Mr. Boss to other patients that he had observed. The standard in this case is one of the totalitarity of the circumstances in order to determine whether or not there is ultimate harassment in this case. It is true that looking at some of these incidents on their own, individually, one might not think, as the district court seemed to feel, that there was a cause of action, but in looking at all of the incidents together, one is reminded of something that Goldfinger had said to James Bond in that novel. He referred to an old Chicago expression, and although I'm from Chicago, I never heard the expression, that the first time is happenstance, the second time is coincidence, the third time is enemy action. In this particular instance, there have been multiple occasions of the retaliation. Retaliation in the form of an evaluation that was less than it had been. And it is true that HUD, in a cosmetic action, did change for one period the evaluation, just as the administrative judge asked HUD to do so. But then HUD reinstated that same evaluation again, the same evaluation that the administrative judge had ruled to be discriminatory, and the same basis was the failure to close out grants. Also, in this particular case, there were other instances of harassment, such as requiring Mr. Boss singularly to adopt HUD Mobile when other employees were not forced to do so. Mr. Boss was also placed on AWOL at a time in which he was extremely ill. He had suffered a stroke, and yet even though he had been extremely ill, he received an extremely scathing email from his supervisor, Ms. Lidius, in which he was threatened with further AWOL. Mr. Boss was subject to these AWOLs, even though other employees who were Caucasian and who had not engaged in EEO activity had not been subject to this kind of discrimination. They had not been subjected to AWOLs, even though one of those employees, David McLuhan, regularly used an exercise machine for 45 minutes every day, and even though another of these employees, Larry Cobb, regularly left work 20 minutes early in order to catch a train, and both HUD and the district court said, well, there's no evidence that action wasn't taken against these individuals, except these individuals continue to do these things on an ongoing basis. And yet, Mr. Boss was singled out, and the only difference between Mr. Boss and these other employees is that he was not Caucasian, and that he had filed an EEO complaint. And it is also true that the harassment continued at a point in which Mr. Boss had filed his EEO complaint. So therefore, we see that in this particular case, the retaliation actually increased as the complaint increased. Again, this is a court and not a theater, and the ramifications were extremely severe. Mr. Boss was actually drummed out of his position and is no longer working at the advice of his positions. Thank you. Thank you, counsel. Mr. Sullivan. May it please the court. Counsel. Larry Boss started off by sending an email in his appendix to his brief. This email from Lydia's explaining something about previous closeouts. This email was not presented to the district court. It was never in his 56.1 statement. The district court never had an opportunity to look at it, and HUD never had the opportunity to respond. And this is a perfect example of how Larry Boss failed to present evidence to the district court. And when he did present evidence to the district court, he failed to do it properly under the local rules. Especially, one great example of this is when Boss brings up his bonus. He claims that his lower evaluation resulted in a lack of a bonus. That was never in his 56.1 statement. HUD never had the opportunity to present evidence that he did, in fact, receive a bonus. And it's impossible to tell from Boss' appellate brief what exactly he argued in front of the district court and what he presented. His statement of the case does no one any favors by simply repeating his arguments. He further confuses the facts by intermingling from this previous administrative judge opinion, facts from that case, into his appellate brief. And it's not clear in his appellate brief that the facts are from a previous case. So, for example, he keeps citing over and over in his appellate brief that Larry Cobb felt intimidated by Lidia's. And Larry Cobb had certain statements about Lidia's. But this is all from a previous case, and it's not apparent when you read his appellate brief that it's not from this case. His evidence that he did present to the courts was clearly in violation of Local Rule 56.1. One simple glance at his 56.1 statement, and it's clear that he did not follow district court's rules. HUD would make simple statements, one or two sentence facts, and Mr. Boss' response would go on for pages and pages at a time, full of irrelevancies, oftentimes never even admitting or denying the facts in HUD's statement. As a result of that, Judge Chang took defendant's facts as admitted and disregarded certain statements by the plaintiff. Continuing with the evidentiary problems, Boss relies on his affidavits, especially from this Dr. Vajardo. But these are self-serving affidavits, which, while okay at the summary judgment stage, they're not okay if the testimony within cannot be presented at trial. Rule 56 of the Federal Rules of Civil Procedure requires that the testimony in that affidavit be admissible at trial, and that requires some sort of foundation. And that's not an easy task, and Boss failed to meet that task. For example, when he claims that he was marked AWOL for missing meetings or missing his work, and he claims that other employees were allowed to leave early or were allowed to miss work, but he doesn't present any evidence that these employees were similarly situated or were treated more favorably. And I think he confuses what it takes to do that, because in his reply brief, he states he meets that criteria by stating the names of people that were not at certain meetings. But that's not enough to show that they were similarly situated or treated more favorably. In particular, his evidence seems to rely on this previous administrative judge opinion. This opinion is a different case, different facts, different issues. It involved HUD, and that's about where the similarities end here. In the administrative judge's opinion, that judge relies consistently and repeatedly on hearsay from Boss's other employees that was related by Mr. Boss. And even if the facts were the exact same in that case as in this case, the district court would review that case de novo. When you look at all Boss's allegations of discrimination, you don't see any adverse employment actions. What you see are the day-to-day gripes of employees everywhere. These are the reasonably foreseeable consequences of what happens when someone breaks the rules or fails to follow policy. When you're caught leaving work early by your director of your agency, you're going to have to file a leaflet. When you miss a meeting, a mandatory meeting, you can bet your boss is going to tell you about it. And even Boss's telework example that he brought up earlier, where he had to substantiate that he could work from home, that's common sense. If you're going to work from home, you must be able to do the work at home. And there were no bad consequences, and that's key, that nothing bad happened to Boss. All he had to do was show that he could work from home while at home. These aren't significant changes in employment status. They don't compare to firing, being suspended, or being demoted. Ultimately, Boss did not have the evidence to support his claims. He could not show an adverse employment action, and he could not show that there were similarly situated employees who were treated more favorably. If this Court has no questions, we ask that you affirm the judgment of the District Court. Thank you, Mr. Sullivan. Anything further, Mr. Fuchs? We did not violate Rule 56.1, notwithstanding the judge's decision. We made very clear where we agreed and where we disagreed. The District Court cited such cases as Bordelon v. School Reform Board of Trustees, in which there was no way of judging what it was that was at dispute. Mr. Boss may have been somewhat eager to express his point of view, but there was no question concerning his point of view. There was no dispute concerning the issues in this case, and the point of the Rule 56.1 is to make clear what the issues are, and there was no dispute as to those issues. With respect to working from home and the HUD mobile, Mr. Boss was working from home, and Ms. Saladias knew the assignment that he was working on. She asked him to do something that he didn't need to do at that time. He was equipped to do the assignments he had, and there's a particular procedure for HUD mobile and another procedure for simply working at home on the computers. He was working from home on the computers according to the procedures he had worked on with IT. Nor is it true that the email that I had referred to is one that wasn't before the District Court. It was definitely one of the exhibits that we had before the District Court, and we made a very strong point about it, and we believe that the mission in both HUD's brief and in the District Court's ruling was simply a convenience on their parts to avoid a smoking gun concerning Ms. Saladias's extreme apprehension concerning Mr. Boss's EEO activity, the apprehension that she brought to the attention of Mr. Meese, and that involved Mr. Richardson. So the fact that Mr. Richardson was involved in this shows that the District Court simply accepted HUD's cosmetic change of transferring Mr. Boss to a supervisor who was prepared to do exactly what Ms. Saladias had been doing in the other case. And also, part of this case concerns the period in which Ms. Saladias was still acting as Mr. Boss's supervisor and in which she was continuing to do the same things that she had been doing and that the judge had found discriminatory in the instance case. It is instructive that Mr. Sullivan made no comment whatsoever to the issue of closeouts. Also, although my colleague suggested that the administrative judge had relied on hearsay testimony, and it is true, the EEO is allowed to consider hearsay testimony, as this Court is not. That was certainly not, as I pointed out in the brief, the strict basis of her findings. Rather, she looked at the entire record, and she referred, for example, to a barrage of emails, a barrage of emails that concerned the issue of closeouts. Precisely the issue that was at this case. With respect to my colleague's suggestion that Mr. Boss did not have an adverse action, it has long been the law of this case and cases such as Smith v. Sheehan that you have to look at the totality of the circumstances to determine whether or not there is an adverse action and determine whether or not there is a hostile work environment. Some of the cases before this Court have also suggested that there doesn't even have to be an exact adverse employment action, as provided that there is retaliation. Thank you, Mr. Fuchs. Thank you, Your Honors. The case is taken under advisement.